FILED

FEB 16 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

KELVIN A. CANADA,

        **Plaintiff,**

v.                                         Civil Action No. 2:13cv13

LT. ROUNTREE, et al.,

        **Defendants.**

## OPINION & ORDER

This matter is before the Court following a bench trial held January 23, 2018 through January 24, 2018 at which Plaintiff Kelvin A. Canada ("Canada" or "Plaintiff") and Defendants Lt. Rountree ("Rountree"), William C. Lane ("Lane"), Capt. Whitehead ("Whitehead"), J. Mayo ("Mayo"), Officer Goodrich ("Goodrich"), Officer Baines ("Baines"), Officer Askew ("Askew"), and Officer Adams ("Adams") (collectively, "Defendants") presented evidence and argument.

Plaintiff alleges that he was subjected to excessive force during a cell extraction that occurred on July 11, 2012, at Sussex I State Prison ("Sussex I"). Plaintiff requested a copy of the video recordings of the incident very shortly after the event. Eventually, Defendants advised the Court that the video recordings could not be found. After a hearing on Plaintiff's Motion for Sanctions based on spoliation, the Court found that Lane was liable for at least negligent spoliation. The Court granted sanctions for negligent spoliation by declining to consider Defendants' Motion for Summary Judgment. However, the Court left open the question of whether the spoliation was purposeful and whether additional sanctions were appropriate.

After the trial, the Court RESERVED RULING on Plaintiff's claims. The Court now **FINDS** that Defendants are not liable on both counts, and the following findings of fact and conclusions of law explain the Court's reasoning.

## I.    FINDINGS OF FACT

**A.    Spoliation**

The spoliation evidence at trial indicated that two (2) videos were spoliated (a handheld video and a rapid eye video) but, among the present Defendants, only implicated Lane in the spoliation. Plaintiff testified that he sent requests to preserve the videos to Lieutenant Robert High, Jr. ("Lieutenant High"), the officer in charge of investigations who would be responsible for the videos. Previous deposition testimony from Whitehead also indicated that Lane should have given the handheld video at issue to Lieutenant High. Despite those apparent procedures, Lieutenant High testified that he never received the handheld video or the requests from Plaintiff. He further stated that the rapid eye videos were automatically deleted because he did not receive a request to preserve them. Lane admitted in testimony that he did not give the handheld video to Lieutenant High. Lane was based in housing unit four (4), where Plaintiff was incarcerated, but Lane's camera for that unit was broken. Lane testified that he borrowed the camera from housing unit three (3), took the video, and then returned the camera to the supervisor's desk in housing unit three (3). He could not recall whether he personally returned the camera or had another officer return the camera. His understanding was that Lieutenant High or his staff would retrieve the camera once it was full in order to store the videos. Lieutenant High also explained that a transition from cameras with tapes to digital cameras occurred around the same time as the video at issue, and he could not recall exactly when the transition occurred.

No evidence of motive to spoliate was introduced. No record evidence contradicts Lane's testimony that he finished his contact with the video immediately after the incident. All of the inmate complaints at issue in this case occurred after the day of the incident, meaning that none of those complaints could provide motive for Lane to act maliciously with the video. Plaintiff also did not offer any other evidence particular to Lane's motives, instead offering general speculation about why any corrections officer might destroy a video.

Plaintiff successfully demonstrated wrongful procedural conduct by the Virginia Department of Corrections ("VDOC"), but while he believed that the evidence indicated a cover up of wrongful conduct, the Court **FINDS** that the evidence demonstrates a systemic problem within VDOC, not a cover up of any wrongdoing by Lane in this particular instance. This Court has had ample opportunities to assess VDOC's grievance system. Every VDOC inmate who files a civil rights case in this Court must first exhaust the available administrative remedies. Therefore, Court personnel have read and reported upon read thousands of informal complaints, inmate requests, regular grievances, and grievance appeals. What has consistently been noted is that the grievance procedure appears to be designed to make it difficult for an inmate to exhaust VDOC's administrative procedures. An informal complaint can only be a brief statement, limited to a single issue. However, if an inmate files another informal complaint on a closely related matter, it is more likely than not that the informal complaint will be found to be repetitive. While it makes sense that inmate complaints about medical care should be filed separately from complaints about a cell extraction, requiring an inmate to parse all the issues that might arise from a cell extraction is inefficient and makes it difficult to determine whether all issues have been exhausted.

3

The Court has noticed over many years of reading reports upon inmate requests and grievances that VDOC obfuscation is not uncommon. The tendency of VDOC personnel is to only address the first "issue," even if that "issue" is a mere contextual statement rather than the actual issue that the inmate is attempting to exhaust.

In this case in particular, problematic rules arose with the time for appeals. Plaintiff's Level I response was mailed to Sussex I. However, Plaintiff had been transferred to Red Onion State Prison. Once Plaintiff received the Level I response, which was after the appeal period had expired, he wrote his appeal to Level II the same day. Nevertheless, Plaintiff's Level II appeal was deemed untimely.[1] This case has highlighted the lack of common sense that appears to permeate VDOC's grievance process.

In a related vein, VDOC employees appear to have a careless attitude toward maintaining video footage of unusual events that occur in VDOC facilities. This case is only one of several cases in recent years to find negligent spoliation of video evidence on the part of VDOC employees. See Muhammad v. Mathena, No. 7:14cv529, 2017 U.S. Dist. LEXIS 11734 at *10 (W.D. Va. Jan. 27, 2017); Raynor v. Pugh, No. 1:13cv1117, 2016 U.S. Dist. LEXIS 187186 at *46 (E.D. Va. Nov. 7, 2014). Such failure to ensure that video evidence related to extraordinary events is preserved is unfortunate. Only saving video evidence if litigation is anticipated may be a reasonable policy. However, when an inmate is bitterly complaining about an incident that occurred, a reasonable person should anticipate litigation. When A. Fowlkes-Miller received Plaintiff's informal complaint, a phone call or email to Lieutenant High would have been a reasonable response.

---

[1] Fortunately, counsel for Defendants wisely chose not to argue that Plaintiff had failed to exhaust his administrative remedies.

Despite the VDOC evidence, none of that evidence implicates Lane or any other named Defendant in intentional misconduct. Lane signed two (2) of the responses at issue in this case, but it appears that he merely approved the responses written by others. See Pl.'s Exs. 2, 3. None of the evidence indicated that he ever personally took any action beyond those approvals of other officials' work, nor were any other Defendants implicated in the relevant evidence.

Thus, because no evidence contradicts Lane's testimony or provides reason to doubt his testimony, the Court **FINDS** that Lane's testimony was credible and further **FINDS** that Lane placed the video on the supervisor's desk in housing unit three (3). Also, because no evidence implicates any other Defendant, the Court **FINDS** that no other named Defendant was involved in handling the spoliated videos.[2]

**B.     Merits**

i. *Excessive Force / Cruel and Unusual Punishment*

Plaintiff testified that the five (5) Defendants who were part of the extraction team on July 11, 2012 at Sussex I used excessive force and that the other three (3) Defendants idly stood by while the extraction team used excessive force. He explained that the incident began when Officer Coffey arrived with a nurse to examine him. He testified that Officer Coffey made some incendiary remarks that were part of an ongoing dispute between them. When the slot in his door was open, Plaintiff threw feces on Officer Coffey in retaliation for the remarks. Plaintiff admitted during his testimony that throwing feces was reactionary and unacceptable. He testified that after he threw the feces, he saw no one outside his cell until the extraction team arrived. He stated that all eight (8) Defendants arrived and that Rountree opened the door while Mayo, Askew, Baynes, Goodrich, and Adams entered his cell and Lane videotaped the

---

[2] There is an open question of whether A. Fowlkes-Miller was negligent or intentional in failing to notify Lieutenant High to preserve the rapid eye videos. Because she is not a Defendant in this matter, though, nor is VDOC, her actions are not relevant to spoliation findings regarding these Defendants.

5

extraction. He testified that he was just standing by his toilet when they opened the door and that they never gave him an opportunity to be restrained before beginning the extraction. He recalled that Mayo entered first with a NOVA shield, threw aside the shield, and punched him in the face, knocking him to the floor. He stated that Askew and Baynes began punching and kicking him while Mayo kicked him in the mouth. He further testified that Goodrich and Adams subsequently joined the kicking and punching. He also observed that he recently had shoulder surgery and that he was in no condition to fight back, nor did he fight back. He noted that his files state that he was supposed to be cuffed in the front due to his shoulder injury and that the Defendants were aware of this because he had been in the unit for almost a year. See, e.g., Pl.'s Ex. 34 at 20 (confirming medical restriction on cuffing his right arm). They cuffed him behind his back anyway. He testified that he had lacerated lips (which required eight (8) stitches), contusions to his face and to the top and back of his head, a swollen face, a re-injured shoulder, and a swollen knee. After he was restrained, he was taken to medical for review. He testified that he was in pain and had headaches for several months after the incident and that his physical therapy for his shoulder was extended due to injuries from the incident.

Plaintiff explained his inmate complaints regarding the incident and entered several of those inmate complaints into evidence. See Pl.'s Ex. 1–11. An Informal Complaint dated July 27, 2012, complains that he was handcuffed behind his back, despite his medical file requiring handcuffing in the front, and further complains that his shoulder was injured as a consequence. See Pl.'s Ex. 1. An Informal Complaint dated August 1, 2012, mentions two (2) prior complaints dated July 12, 2012 and July 21, 2012, and alleges that he was assaulted by the extraction team even though he never refused to be restrained. See Pl.'s Ex. 2. An Informal Complaint dated August 6, 2012, mentions a prior complaint dated July 15, 2012, and asks for

6

the preservation of the video of the extraction "for litigative purposes." See Pl.'s Ex. 4. The first document to mention kicking and punching is the Level II appeal, dated November 7, 2012. See Pl.'s Ex. 11 at 3.

Defendants testified that the extraction was a routine cell extraction, with some discrepancies in the details recalled by each Defendant. Mayo, Adams, and Askew testified that there was feces everywhere inside the cell, while Whitehead testified that there was feces and toilet paper outside the cell as well. Baines further stated that he was gagging from the smell. Mayo, Adams, and Whitehead all testified that the cell was dark because something was blocking the cell window. Mayo testified that he entered first with the shield, Askew said that he was second in line, Adams said that he was third, Goodrich said that he was either fourth or fifth, and Baines said that he was fifth. Mayo stated that Plaintiff charged them when they entered, while Askew testified to recalling Plaintiff's arm coming out of the cell. The other three (3) extraction team officers recalled something hitting the line, which they presumed was Plaintiff. The three (3) supervising Defendants also stated that Plaintiff charged at the extraction team. Rountree and Whitehead testified that they asked Plaintiff to present himself to be restrained, while Lane also testified that they asked him to voluntarily be restrained. Rountree stated, and the extraction team members agreed, that Rountree waived the team in. Mayo testified that he knocked Plaintiff to the ground with the shield. Mayo stated that he fell on top of Plaintiff and pinned him with the shield, which resulted in injury to Plaintiff's face and mouth. Rountree noted that the extraction team went to the ground on top of Plaintiff. Mayo and Adams readily admitted that they cuffed Plaintiff behind despite his health note, and Rountree further testified that all inmates are cuffed behind the back during a cell extraction for the safety of the officers. Askew also noted that cell extractions are high risk and that, as a result, corrections officers do

7

not follow medical profiles like cuffing in the front during cell extractions. Rountree testified that the officers subsequently took the restrained Plaintiff to medical.

Both Plaintiff's and Defendants' testimony varied from previous statements they have made in this case. Plaintiff's description of the incident and his injuries were portrayed as being much worse at trial than in his prior pleadings. At trial, Plaintiff also claimed that after throwing feces on Officer Coffey he threw nothing else out of his tray slot. However, in Plaintiff's Counter Affidavit, Doc. 42, Plaintiff claims that he threw toilet paper that he used to clean feces off his tray slot for approximately five (5) more minutes. In his Counter Affidavit, Plaintiff described the cell extraction very differently than he did at trial. In his Counter Affidavit, Plaintiff claims that he was easily apprehended and restrained. Id. at 26. Plaintiff claimed that after he was placed in restraints, then four (4) of the Defendants began to beat him. At trial, Plaintiff testified that he was not restrained, but rather that Mayo immediately threw aside the NOVA shield, and punched Plaintiff, and then all five (5) Defendants began to beat and kick Plaintiff. Conversely, for Defendants' part, there was a slight discrepancy regarding how Plaintiff landed on the floor. In his Affidavit, Doc. 34-6, Mayo claimed that the extraction team drove Plaintiff to the back wall, then Plaintiff slid down to the floor. However, at trial, Defendant Mayo and the other extraction team members claimed that they all fell on top of Plaintiff on the floor before reaching the back wall.

The site medical director for Sussex I on the day of the incident, Dr. Benjamin Ulep, testified regarding his records of Plaintiff's injuries. His records indicate that Plaintiff had contusions on his head and face, clotted blood in his nose, a 1.5 centimeter gape on his mouth, and abrasions on his lower extremities. See Pl.'s Ex. 34 at 27. They also indicate that he checked the shoulder at Plaintiff's request and that it appeared intact but was tender. See id.

They also conclude that Plaintiff had "Mild, Minor Injuries to Scalp, Mouth & Ankles consistent w[ith] Alleged Forced Cell Extraction." Id.

The Court **FINDS** that Defendants' testimony is more credible in part because Plaintiff's injuries from the extraction are more consistent with Defendants' recollection of the event than Plaintiff's. Defendant Mayo testified that members of the extraction team are chosen for their brawn. The five (5) Defendants who served as the extraction team were all brawny men. If these large corrections officers, one (1) of whom weighs more than three hundred (300) pounds, were truly kicking and punching Plaintiff, he would be expected to suffer far worse injuries than the bruises and lip laceration that are in the record. Plaintiff testified that he was kicked approximately ten (10) times and punched approximately ten (10) times. The cell extraction of an inmate who does not want to be extracted necessarily involves a degree of force, and Plaintiff's injuries are consistent with a forcible cell extraction, not a vicious assault.

The Court recognizes that a number of Defendants as well as the Plaintiff had discrepancies to their testimony. In Defendants' situation, those changes reflect hazy memories over the passage of time and suggest that they did not coordinate their stories. However, Plaintiff's version of the events has varied significantly and become more favorable to him on each recollection. He began by complaining about the cuffing behind his back, which was understandably painful in light of his shoulder injury, but which was not actionable. As noted infra, his allegations of punching and kicking appear in the exhibits for the first time when appealing an adverse decision on his initial inmate complaints, which suggests that he was attempting to convert pain from proper action (cuffing behind the back during cell extraction) to pain from illegal action (unhinged beating) in order to help his claim survive. Thus, the Court **FINDS** that Defendants' description of the cell extraction is more credible than Plaintiff's.

The Court also accepts the Defendants' description of Plaintiff's resistance because it is more consistent with the rest of his interactions with corrections officers. Plaintiff himself admits his proactive approach to resolving perceived injustices from corrections officers, such as throwing feces on Officer Coffey, or keeping his arm outside of his slot against policy to protest denial of food. His testimony that he docilely stood by while the extraction team entered is inconsistent with his self-described character as a proactive inmate, and the Court does not find that testimony credible. Moreover, Plaintiff's detailed testimony makes it clear that he knew the extraction team was assembled and preparing to extract him from his cell. Had Plaintiff wished to avoid a cell extraction, he could have voluntarily offered to be cuffed before Whitehead secured the tray slot. Plaintiff did not do this. Thus, the Court also **FINDS** that Plaintiff was not trying to avoid a confrontation with Defendants and Plaintiff was not completely docile during the cell extraction.

### ii. *Pattern and Practice*

Plaintiff alleged that the excessive force used against him was part of a pattern and practice of use of excessive force at Sussex I. He called five (5) witnesses who are at Sussex I or who were previously incarcerated there: Melvin Alston ("Alston"), Salvadore Corado ("Corado"), Terry Ferguson ("Ferguson"), Jose Duran ("Duran"), and Uhuru Sekou Obataiye-Allah ("Obataiye-Allah").

Alston testified regarding an incident in early July 2012, which Plaintiff had also previously described as the beginning of Plaintiff's conflicts with Officer Coffey. Alston, Plaintiff, and other inmates were outside in the recreation yard when one (1) inmate allegedly passed out. Alston alleged that they refused to return to their cells after recreation until the passed out inmate received medical attention. He further testified that after he was returned to

his cell, the corrections officers denied him lunch, and he stuck his arm through the slot in his cell door and refused to take it out until he was fed. He stated that Lane then shocked his arm with a NOVA shield while Adams poured water on his arm. He further stated that Officer Coffey obtained a second NOVA shield, and then one (1) of the three (3) officers pepper sprayed him. He also alleged that Lane and Adams twisted his arm. Beyond that alleged incident, he also testified that he heard Plaintiff's extraction at issue in this case, and that he heard Mayo say "yeah, that's why I beat your ass."

Corado testified to an incident of unknown date.[3] He explained that he had an altercation with officers because he was refusing to give them some handcuffs. He stated that he was given an opportunity to volunteer for restraints before a cell extraction, but that he denied the opportunity, and the officers then entered his cell. He testified that he was handcuffed and then beaten, but he did not recall who was involved on direct examination. On cross-examination, he admitted that he swung the handcuffs inside a sock at the officers when they entered and that a Lieutenant Jones gave him a disciplinary write-up for Corado assaulting him with the handcuffs. He did not identify any of the named Defendants in this case as part of the incident.

Ferguson testified to three (3) different incidents in 2010. For the first incident, he alleged that he stuck his arm through the slot because his tray was missing some food, and after he refused to pull his arm back without more food, an officer sprayed him with gas through the slot. For the second incident, he alleged that Baines and an Officer Douglas gave him a phone to make a call, then unplugged it, and he put his arm through the slot in protest, and Defendant Lane then shocked him with an electric shield. For the third incident, he argues that he put his arm through the slot to protest missing food again, and an Officer Lance and Defendants Mayo,

---

[3] He testified that he was at Sussex I from 2005 through around April of 2012, and the incident occurred during that timeframe.

11

Lane, and Rountree, put his arm back into the slot and then performed a cell extraction along with other officers. He further alleged that they restrained him, wrestled him to the ground and then kicked and punched him. Beyond his three (3) incidents, he also briefly testified to a couple of extractions in 2010 and testified to hearing Canada scream when Defendants entered his cell in the extraction at issue in this case. He admitted in cross-examination that he may actually have been transferred out of Sussex I a few months before Canada's extraction occurred and could not remember for certain either way.

Duran testified to two (2) incidents sometime in 2009–2010. For the first incident, he alleged that after officers extracted his brother from his cell, they extracted Duran, too. He further stated that they requested he cuff up, which he did, and they still extracted him anyway and then beat him while he was not resisting. For the second incident, he testified that he left his arm out of his door slot in protest over a food tray that had the wrong portions and the wrong diet, and that officers responded by shocking him with a shield and macing him. He alleged that Rountree, Whitehead, and an officer named Jones were involved with both extractions and that Askew was involved with the first. On cross examination, he admitted to recalling the involvement of a few other officers (who are not named Defendants in this case) and to having thrown some unknown liquid substance on Rountree before one (1) incident and on another officer during the other incident. Besides the incidents personal to him, he also testified to recalling the incident involving Corado and handcuffs.

Obataiye-Allah testified to two (2) incidents involving other inmates and one (1) incident involving himself. For the first incident with others, of an unknown date, he testified that Rountree, along with Officers Epps and Dudley, beat a naked inmate in the shower, then dragged him naked back to his cell where they beat him again. For the second incident with others, in

May 2012, he stated that Christopher Joyner stuck his arm out of his door slot in protest, saying that he was allergic to the food that the officers gave him and that he needed different food. Obataiye-Allah further alleged that Askew refused to get new food, Goodrich twisted Christopher Joyner's arm, officers cuffed up Christopher Joyner, and then those two (2) Defendants along with Rountree and Officer Dudley entered the cell, where they banged Christopher Joyner around his cell. For the incident with himself, Obataiye-Allah testified that he refused to leave the shower when Rountree told him to leave, and in response, Rountree and other officers pushed him in his cell, hit him, and held him down. He stated that "[i]t wasn't nothing real major" but that it was "outside of policy." Obataiye-Allah also described that he always refuses to cuff up when asked by officers because he thinks they will beat him anyway, and he wants to stay ready to fight.[4] Beyond those incidents, he also mentioned that he recalled a couple of cell extractions involving Plaintiff, although the only detail that he could recall involved Rountree, Lane, and others who he could not recall removing Plaintiff from a shower to his cell. On cross-examination, he stated that he never had any problem with several of the corrections officers, including Defendants Whitehead and Mayo, and never saw these two (2) Defendants involved in any use of excessive force.

At best, only Alston was discussing events that occurred close in time to the extraction at issue in the case. Two (2) of the witnesses, Ferguson and Duran, testified to events back in 2009 and 2010, years before the incident in 2012, and their testimony would not establish a pattern or practice connected to Plaintiff's incident at issue. One (1) of those witnesses, Ferguson, also called his credibility into question when he recounted Plaintiff's extraction despite his own doubts about whether he was even in Sussex I at the time of the extraction. A third witness,

---

[4] This remark was part of describing an incident of unknown date where he was extracted from his cell without being given the opportunity to cuff up.

Corado, admitted that he had handcuffs that he refused to return and that he assaulted an officer with those handcuffs before he was extracted. A fourth witness, Obataiye-Allah, largely offered stories about other inmates and expressed very limited details on any of them. His testimony that he always refused to cuff up also undermines the weight of his testimony that he was not given the opportunity to cuff up before a cell extraction. Only Alston's testimony is helpful to Plaintiff's case. Thus, the Court **FINDS** that Corado was not credible because he attempted to paint an innocent picture of himself in an incident where he illicitly kept handcuffs and then assaulted an officer with them; **FINDS** that Ferguson was not credible because of his likely false testimony regarding an event he did not witness; **FINDS** that Obataiye-Allah was not credible because of his meandering testimony of a few incidents of unknown dates, many without names, and his own policy of refusing to cuff up in incidents involving him. The Court declines to make any findings regarding the remaining two (2) inmates because their testimony would not alter the legal conclusion in this matter.

## II. CONCLUSIONS OF LAW

### A. Spoliation

The Court previously FOUND spoliation by Lane but RESERVED RULING on whether Lane or any other named Defendant committed purposeful spoliation. Doc. 104 at 2. In order to apply any further sanction, the Court must find intentional spoliation on the part of a Defendant. See Fed. R. Civ. P. 37(e)(2). At trial, Plaintiff had the burden to prove that the spoliation was purposeful. See Federico v. Lincoln Military Hous., LLC, No. 2:12cv80, 2014 WL 7447937, at *6 (E.D. Va. Dec. 31, 2014) (applying the burden of proof to "the party seeking the sanction"). The systemic problems at VDOC appear concerning. Nevertheless, Plaintiff's request that this Court find intentional spoliation requires inference upon inference. The Court would have to

infer that Lane acted intentionally in the absence of any direct evidence, apply a presumption that the missing videos were harmful to Defendants' case, and then infer that the presumption meant that Defendants used excessive force. The Court cannot infer that the video is harmful in order to find willful spoliation because such an inference is a <u>sanction after</u> finding intentional acts, not a <u>basis for</u> finding intentional acts. Plaintiff failed to meet his burden to prove intentional acts by Lane or any other Defendant. The Court cannot decide whether VDOC as an institution or any other officials besides Defendants committed intentional spoliation because none of them are before this Court. Thus, the Court **FINDS** that even if Lane committed negligent spoliation but not intentional spoliation, no other sanction for spoliation is appropriate.

Negligent spoliation does not entitle Plaintiff to any attorney's fees or other award, but the evidence of VDOC's approach to inmate complaints suggests that improvements should be made.

**B.    Merits**

*i.    Excessive Force / Cruel and Unusual Punishment*

The Eighth Amendment, enforced against the states through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. Const. amends. VIII, XIV. The Eighth Amendment protects prisoners from the "unnecessary and wanton infliction of pain." <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) (citations omitted). To establish an Eighth Amendment excessive force claim, an inmate must satisfy a subjective component — that the prison official acted with a sufficiently culpable state of mind — and an objective component — that the harm inflicted on the inmate was sufficiently serious. <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996).

15

Plaintiffs Eighth Amendment excessive force claim must be measured according to the standards set forth in Whitley. In order to establish an Eighth Amendment claim, plaintiff must allege and prove "obduracy and wantonness, not inadvertence or error in good faith . . . ." Whitley, 475 U.S. at 319. The issue is whether the Defendants inflicted unnecessary and wanton pain and suffering.

With respect to the subjective element, the Court must inquire "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 320–21 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The Supreme Court has set out the following factors to evaluate whether a prison official acted maliciously and sadistically: (1) the need for the use of force, (2) "the relationship between that need and the amount of force used," (3) the threat "reasonably perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response." Hudson v. McMillian, 503 U.S. 1, 7 (1992). The absence of serious injury is also relevant, though not dispositive of the subjective analysis. Id. "The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).

With respect to the objective element, a prisoner "asserting malicious and sadistic use of force need not show that such force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." Williams, 77 F.3d at 761 (quoting Hudson, 503 U.S. at 9). It is clear that not every touching is of constitutional significance.

> The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

Glick, 481 F.2d at 1033.

Plaintiff has not established the subjective element of excessive force. Defendants' attempt to restrain him using a cell extraction demonstrated that they were restoring discipline after he threw feces. The incident began when he refused to voluntarily submit to restraints, instead throwing feces out the slot in his door. Once he had successfully deterred the officer with whom he had issues, Officer Coffey, he could have volunteered for restraints.

Rountree testified to being familiar with Plaintiff's habit of throwing feces, and he reasonably perceived that there was a risk of further throwing if he did not order an extraction. Thus, the Hudson factors favor a finding that Defendants' state of mind was merely that of restoring order when an inmate was acting in an unruly manner, and the Court **FINDS** that Plaintiff failed to prove the subjective element of excessive force.

Plaintiff has also not established the objective element of excessive force. The lack of serious injuries indicates that the force used was the force of a routine cell extraction. Any finding that these injuries, as reported by Dr. Ulep, demonstrated objectively excessive force would cripple prisons from being able to manage unruly offenders. These injuries reflect force restricted to the amount necessary to restrain a prisoner, which is consistent with permissible force under Glick.

Thus, the Court **FINDS** that Defendants did not use excessive force against Plaintiff in the incident at issue in this case. Because there is insufficient evidence of excessive force, the Court further **FINDS** that no bystander liability or deliberate indifference has been proven in this case.

### ii. *Pattern and Practice*

Plaintiff failed to establish a pattern and practice. "In order to establish a claim based on allegations that a pattern or practice caused their injury, plaintiffs must show that:

> (1) an unconstitutional custom or practice was so common as to have the force of law,
> (2) the responsible policy makers were actually or constructively aware of its existence,
> (3) they failed through specific intent or deliberate indifference to stop the practice, and
> (4) a sufficiently close causal link exists between the unconstitutional practice and the violation of plaintiffs' rights.

Massasoit v. Carter, 439 F. Supp. 2d 463, 481 (M.D.N.C. 2006) (citing Spell v. McDaniel, 824 F.2d 1380, 1390–91 (4th Cir. 1987). Even presuming that Alston and Duran were credible, they only established limited incidents in 2009–10 and an incident in 2012, which would be more consistent with isolated incidents than a systematic pattern of activity. No Defendants identified in Alston's incidents were also involved in Duran's incidents, either, further defeating the existence of any pattern. Thus, the Court **FINDS** that Plaintiff has not proven a pattern and practice of abuse.

### III. CONCLUSION

For the reasons stated herein, the Court **FINDS** that Defendants are not liable on either count. The facts in this case do not support finding these Defendants liable under Plaintiff's § 1983 claims.

18

The Clerk is **REQUESTED** to send a copy of this Opinion & Order to all counsel of record.

It is so **ORDERED**.

                                                    /s/
                                     Henry Coke Morgan, Jr.
                                     Senior United States District Judge

                               HENRY COKE MORGAN, JR.
                               SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 16, 2018